

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

## No. 07-10-00037-CV

JIMMY GLEN RIEMER, INDIVIDUALLY AND AS INDEPENDENT
EXECUTOR OF THE ESTATE OF HUGO A. RIEMER, JR., DECEASED,
RICHARD COON, JR., JUNE MEETZ COON TRUST, JOHNSON BORGER
RANCH PARTNERHSIP, AND MONTFORD T. JOHNSON, III ON BEHALF
OF THEMSELVES AND OTHERS SIMILARLY SITUATED, APPELLANTS

V.

THE STATE OF TEXAS AND JERRY PATTERSON, AS COMMISSIONER
OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, APPELLEES

On Appeal from the 84th District Court
Hutchinson County, Texas
Trial Court No. 30,441, Honorable David L. Gleason, Presiding

November 26, 2014

## OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

This is our second interlocutory review of the trial court's December 2009 order denying certification of a proposed class action.[1]  Appellants, and proposed class representatives, are Jimmy Glen Riemer, Richard Coon, Jr., the June Coon Trust, the

---

[1] Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(3) (West Supp. 2014).

Johnson Borger Ranch Partnership, and Montford Johnson III. Appellees are the State of Texas and Jerry Patterson in his capacity as Commissioner of the General Land Office (jointly, the State).

By a 2011 opinion, we expressed disagreement with the trial court's conclusion that the record showed some proposed class representatives lacked standing to assert a takings claim, but agreed with the trial court's finding that the proposed representatives could not adequately protect the interests of the class. We thus affirmed the trial court's order. *Riemer v. State,* 342 S.W.3d 809 (Tex. App.—Amarillo 2011), *rev'd,* 392 S.W.3d 635 (Tex. 2013). The Supreme Court of Texas reversed the adequacy-of-representation determination and remanded the case for review of the other contested requirements for class certification. 392 S.W.3d at 642. Having conducted that review, we will affirm the trial court's order denying certification.

Background[2]

Appellants' takings claims arise from their dispute with the State over the boundary between the State-owned riverbed of the Canadian River and appellants' riparian surface and mineral interests along a twelve-mile stretch of the river in Hutchinson County. The course of the river subject to this suit stretches east from the Sanford Dam, which impounds Lake Meredith. It lies between the dam and the property at issue in *Brainard v. State*, 12 S.W.3d 6 (Tex. 1999).

---

[2] We mention only so much of the factual and procedural background of this case as necessary for our disposition. Additional information may be found in the opinions in *State v. Riemer,* 94 S.W.3d 103 (Tex. App.—Amarillo 2002, no pet.) and *Riemer v. State,* 342 S.W.3d 809 (Tex. App.—Amarillo 2011), *rev'd,* 392 S.W.3d 635 (Tex. 2013).

Appellants assert that the State's adoption of a 1981 river boundary survey ("Shine I" survey)[3] erroneously expanded the riverbed, adding to the State's property and unconstitutionally taking their property.[4] In their lawsuit, appellants sought to represent a class described as:

> All owners, from 1981 to the present, of any real property interest adjacent to the Canadian Riverbed from the Sanford Dam east approximately 12 miles to the west boundary of Section 13, Block 47, H.&T.C.RR. Co. Survey, on the north side of the river, and to the west boundary of Section 56, Block 46, H.&T.C.RR. Co. Survey, on the south side of the river.

They requested division of the class into two sub-classes, one containing owners of surface interests adjacent to the riverbed, the second, owners of mineral or leasehold interests.[5]

After a hearing, the trial court signed an order denying certification. In addition to the finding previously reviewed, regarding the adequacy of appellants' representation of

[3] As appellants' brief explains, the State commissioned Darrell Shine to survey the boundary of the river in a portion of the lands at issue in this suit. He sent his "maps, reports and field notes" from his survey to the General Land Office for filing in January 1982. This product the parties refer to as the "Shine I" survey. Later in the 1980s, the State employed Shine to survey the boundaries of the river across land that later was at issue in the *Brainard* boundary litigation. *See Brainard*, 12 S.W.3d at 11. The parties refer to this second survey as "Shine II." We will use the parties' shorthand designations.

[4] The Texas Constitution provides that, "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . . ." TEX. CONST. art. I, § 17; *Tex. Southern Univ. v. State St. Bank & Trust Co.,* 212 S.W.3d 893, 903 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). In a claim for inverse condemnation, a "taking" occurs when property is taken for public use without process or without proper condemnation proceedings. *Allen v. Texas City,* 775 S.W.2d 863, 864 (Tex. App.—Houston [1st Dist.] 1989, writ denied).

[5] Minerals underlying the State's riverbed are under lease to J. M. Huber Corporation. Huber was a defendant, but appellants' claims against Huber were settled and dismissed in 2008.

the proposed class, the trial court found the claims of the class representatives were not typical of the class claims,[6] and found that none of the provisions of rule of civil procedure 42(b) were satisfied.[7]

Analysis

Under rule of civil procedure 42, class certification requires satisfaction of four prerequisites:

> (1) numerosity—the class is so numerous that joinder of all members is impracticable; (2) commonality—there are questions of law or fact common to the class; (3) typicality—the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy of representation—the representative parties will fairly and adequately protect the interests of the class.

*Citizens Ins. Co. of America v. Daccach,* 217 S.W.3d 430, 438 (Tex. 2007) (citing TEX. R. CIV. P. 42(a)). Additionally, a class action must satisfy at least one requirement of Rule 42(b). *See* TEX. R. CIV. P. 42(b).

We review a trial court's order on certification for abuse of discretion. *Bowden v. Phillips Petroleum Co.,* 247 S.W.3d 690, 696 (Tex. 2008). A trial court generally has broad discretion to determine whether to certify a class action, but it must apply a rigorous analysis to determine whether all certification requirements have been satisfied. *Id.* at 696; *Southwestern Ref. Co. v. Bernal,* 22 S.W.3d 425, 435 (Tex. 2000).

---

[6] *See* TEX. R. CIV. P. 42(a)(3). The State did not challenge the qualification of the proposed class under the numerosity and commonality requirements. *See* TEX. R. CIV. P. 42(a)(1), (2). Appellants' pleadings allege there are more than 300 class members. They seek some $40 million in damages.

[7] *See* TEX. R. CIV. P. 42(b).

A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding principles. *Bowden,* 247 S.W.3d at 696 (citing *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex. 1992)). "Because Rule 42 is patterned after Federal Rule of Civil Procedure 23, federal decisions and authorities interpreting current federal class action requirements are instructive." *Riemer,* 392 S.W.3d at 639 (citing *Bernal,* 22 S.W.3d at 433).

Rule 42(b)

To be prosecuted as a class action, an action must meet one of the requirements of rule 42(b). On appeal, appellants argue the trial court abused its discretion by finding they failed to establish their takings action meets the requirements of rule 42(b)(1)(A) and 42(b)(3).

Rule 42(b)(1)(A)

Rule 42(b)(1)(A) provides an action may be maintained as a class action if "the prosecution of separate actions by . . . individual members of the class would create a risk of . . . inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." "Basically the phrase 'incompatible standards of conduct' is deemed to refer to the situation in which different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." 7AA C. Wright, A. Miller & M. Kane, Federal Practice & Procedure: Civil 3d § 1773, at 15-16 (2005 ed.); *Compaq Computer Corp. v. Albanese,* 153 S.W.3d 254, 262 (Tex. App.—Beaumont 2004, no pet.) (citing *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d

5

675, 691-92 (Tex. 2002) ("[A] court must not certify a mandatory class under (b)(1)(A) unless there is a palpable risk the defendant will be placed in a position of being incapable of complying with one judgment without violating the terms of another").[8]

Arguing class actions were "tailor-made" for claims involving riparian landowners, appellants point to a comment to federal rule 23. "To illustrate: . . . . individual litigations of the rights and duties of riparian owners . . . could create a possibility of incompatible adjudications." FED. R. CIV. P. 23 cmt. 1966 Amendment, subdivision (b)(1). Federal rule 23(b)(1)(A) "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against down river owners)." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (internal quotation marks and citation omitted).

Appellants do not rely on a contention that the risk of differing compensation awards warrants class action treatment under rule 42(b)(1)(A). They instead argue that to adjudicate their takings claims it will be necessary to determine the actual river boundary prior to the taking. The risk of inconsistent outcomes from that determination,

---

[8] *Accord Wagner & Brown v. Horwood,* 53 S.W3d 347 (Hecht, J., dissenting from denial of motion for rehearing of petition for review) (quoting *St. Louis Southwestern Railway v. Voluntary Purchasing Groups, Inc.,* 929 S.W.2d 25, 32 (Tex. App.— Texarkana 1996, no writ) ("When the only risk is that some plaintiffs may win while others may lose on identical facts, the problem of inconsistent or varying adjudications is not raised. That portion of the rule applies to situations where inconsistent judgments in separate suits places a defendant in the position of not being able to comply with one judgment without violating the terms of another").

"different determinations of what constitutes the riverbed on adjacent, or even the same, parcels of property," they argue, warrants class adjudication. We cannot agree. Even assuming the trial court was required to agree with appellants' perception of the risk of inconsistent boundary determinations in the course of the takings adjudication, appellants have not demonstrated how such determinations would establish incompatible standards of conduct for the State, post-taking. In separate suits some plaintiffs might recover money and others might not. That circumstance does not, without more, place the State in a position of being unable to comply with one judgment without violating another. *See In re Bendectin Liability Litigation,* 749 F.2d 300, 305 (6th Cir. 1984) ("the fact that some plaintiffs may be successful in their suits against a defendant while others may not is clearly not a ground for invoking Rule 23(b)(1)(A)").

We find the comment to federal rule 23 has no application to this litigation. Although appellants assert riparian lands have been taken, the case does not involve opposing claims to use of water between up- and down-stream owners, or any similar claim. *See Amchem,* 521 U.S. at 614. Nor have appellants demonstrated they and the State are so situated that "practical necessity forces the opposing party to act in the same manner toward the individual class members and thereby makes inconsistent adjudications in separate actions unworkable or intolerable." 7AA C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 3d § 1773, at 22 (2005 ed.).

Rule 42(b)(3)

Appellants also assert they established class certification is proper under rule 42(b)(3). A class action may be maintained under subsection (b)(3) when "questions of

7

law or fact common to the members of the class predominate over any questions affecting only individual members" and resolution of the matter as a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." TEX. R. CIV. P. 42(b)(3); *see Amchem,* 521 U.S. at 615 (discussing federal rule 23(b)(3) and noting it "invites a close look at the case before it is accepted as a class action"). This type of class differs from that of rule 42(b)(1)(A) as it is not mandatory but requires an opt-out feature for class members. *See* TEX. R. CIV. P. 42(c)(2)(B)(v). Rule 42 provides a list of nonexclusive factors aiding the court's determination of the propriety of certification under (b)(3):

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

TEX. R. CIV. P. 42(b)(3); *Daccach,* 217 S.W.3d at 438-439.

Predominance

Determining whether common issues predominate is "one of the most stringent prerequisites to class certification." *Stonebridge Life Insurance Company v. Pitts,* 236 S.W.3d 201, 205 (Tex. 2007) (per curiam). In so doing, a court identifies the substantive issues that will control the outcome of the litigation, assesses the issues that will predominate, and determines if the predominating issues are those common to the class. *Bernal,* 22 S.W.3d at 434. Predominance does not merely mean common questions of law or fact outnumber uncommon issues; rather, the question is whether common or individual issues will be the focus of most of the efforts of the litigants and

the court. *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.,* 308 S.W.3d 909, 920 (Tex. 2010). If presentation and resolution of individual issues "is likely to be an overwhelming or unmanageable task for a single jury" after common issues are resolved, then common issues do not predominate. *Bernal,* 22 S.W.3d at 434. For the reasons that follow, we agree with the trial court's conclusion the predominance requirement was not met.

*Controlling Issues*

The trial court's order denying certification contains the following statements:[9]

- "The elements of a claim for inverse condemnation are an intentional act that resulted in a 'taking' of plaintiff's property for public use without adequate compensation."[10]

- "In order to establish a taking, each individual landowner will have to establish that individual's land ownership, the specific lands taken, the value of such lands and any damage to the remaining lands held by each plaintiff."[11]

- "In addition to the issues concerning the applicability of limitations, the individual issues relating to limitations and proof of what land was taken and the damages associated with each taking will predominate and be the object of most of the efforts of the litigants and the court, rendering class certification inappropriate."

Appellants' expression of the controlling issues is not significantly different. In appellants' view, however, the controlling issues are common to the class members.[12]

---

[9] *See* TEX. R. CIV. P. 42(c)(1)(D) (requiring certain statements in order granting or denying certification).

[10] To establish their takings claims, appellants must prove: (1) the State intentionally performed certain acts, (2) that resulted in a "taking" of property, (3) for public use. *General Services Comm'n v. Little-Tex Insulation Co., Inc.,* 39 S.W.3d 591, 598 (Tex. 2001).

[11] *See Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 627 (Tex. 2002) (stating standard for compensation for partial taking under eminent domain).

9

The State argues the land ownership issues necessary to the takings determination will require individual inquiry, and we think the trial court had good reason to agree. In that regard, we note the distinctions between appellants' takings claims and the legislatively-authorized boundary suit litigated in *Brainard*. *See Brainard*, 12 S.W.3d at 12. There, the State advocated the correctness of the Shine II survey which, based on the "artificial change theory" that disregarded the construction of the Sanford Dam, concluded the riverbed averaged some 3400 feet in width. The landowners obtained a survey conducted by W. C. Wilson, Jr., who found a riverbed approximately 20 to 50 feet wide based on a gradient boundary survey done under present conditions. *Id.* The dispute was resolved in the landowners' favor, on summary judgment, a resolution ultimately affirmed by the Supreme Court of Texas. *Id.* at 27.

In the current litigation, appellants plead that a properly-conducted boundary survey like that conducted by surveyor Wilson in *Brainard* will find a riverbed about

_____

[12] Their brief in this court states:

> Here, substantive issues will control the outcome of the case. All class claims are based on the State's unconstitutional taking. Accordingly, the fact issues involved are (1) whether the State's 1981 Shine Survey I constituted a taking of land by the State, (2) the actual location of the Canadian Riverbed at the time of the taking as established by a proper, present-day gradient boundary survey, (3) whether, given the actual boundary between the Canadian Riverbed, the State took property for a public purpose without just compensation, and (4) if so, the value of the property interests taken.
>
> Undoubtedly, the first three of these issues will predominate in establishing Appellants' claims. Indeed, they are the principal fact inquiries necessary to establish the proposed class claims. *Equally certain, they are common to all class members. Indeed, all class members are riparian landowners who own land or mineral interests within what the State purports to be a riverbed leased to Huber.* (italics ours)

twenty to fifty feet wide.[13]  Appellants do not, however, have in hand a survey showing what they contend to be the true location of the riverbed, at the present time or as of 1981,[14] so they at this point are able to describe only in general terms the property they contend the State has taken.  We do not say that class-wide adjudication of each member's taking claim is precluded merely because the property each member claims to have been taken is not at the outset of the litigation identified and located.  But the trial court would not have been unreasonable to see the circumstance as multiplying the issues inherent in the litigation of each member's takings claim, and increasing the chances that the issues will take on a more tract-specific and individual nature.

*Incomplete Coverage of Shine I Survey*

As noted, appellants' suit is based on the contention the State's acceptance and filing of the 1981 Shine I survey constituted the act of taking.  But it is undisputed that the Shine I survey covers only part of the twelve-mile passage in dispute.  The trial court's order denying certification found "[t]he existence, location, and/or propriety of the 1981 Darrell Shine survey is not a matter common to the proposed class because the area proposed to be included in the class includes several miles of the Canadian

---

[13] The trial court could anticipate the State would assert a contrary view.  The record contains a 2005 affidavit by C. B. Thomson, then Director of Surveying for the General Land Office.  Thomson describes his personal familiarity with the lands at issue in *Brainard* as well as those in the present case subject to the Shine I survey, and describes differences in the two areas of the river.  He states that lands for several miles below the Sanford Dam lack the type of twenty-to-fifty-foot stream shown in *Brainard*.  Thomson also states that in the same area below the dam, he found no banks like those identified by the landowners' surveyor in *Brainard*.

[14] *See Riemer*, 94 S.W.3d at 106 (contrasting posture of *Brainard* litigation with claims then asserted by Mr. Riemer).

Riverbed that are not a part of the 1981 Darrell Shine survey and because the location of that survey must be individually ascertained with respect to each parcel of land." The nature and dates of the State's acts constituting the taking of lands in the miles not covered by the Shine I survey would not appear to be issues common to the class. Further, even in the area surveyed by Shine I, the trial court heard evidence that its adoption did not lead to a taking of land in every tract. As the State points out, Riemer testified that one section of Riemer land is not included in his counterclaim. This despite its location downstream of the Sanford Dam and within Shine I. The record does not show whether that circumstance is unique to that section or is true elsewhere for other landowners. As it evaluated whether adjudication of issues common to the class or those requiring individual adjudication would occupy more of the court's and litigants' time and attention, the trial court reasonably could have concluded the evidence of differing acts of taking pointed to the latter conclusion.

*Limitations*

The trial court's order denying certification states, "The State has established that the affirmative defense of the 10-year statute [of] limitations applicable to takings claims will predominate in the adjudication of the issues in this case." Appellants take issue with the court's application of a ten-year limitations period to their takings claims. We do not undertake here to determine the correctness of the trial court's conclusion because it is not necessary to our disposition of the issue before us. Our disposition of appellants' challenge to the court's finding that common questions of law and fact do not predominate over questions affecting individual members does not turn on the limitations issue. We would reach the same disposition on predominance if no

12

limitations question were raised in this case.  However, we do say that the presence of the limitations issue in the case does not favor appellants' position on the predominance issue.

*"Rails to Trails" Cases*

In support of class treatment of their takings claims, appellants point to the analyses to be found in class action proceedings arising from the "Rails to Trails" mechanism adopted by amendments in 1983 to the National Trails System Act.  16 U.S.C., Chapter 27; *Id.* at § 1247(d).  The amendments authorized the Interstate Commerce Commission[15] "to preserve for possible future railroad use rights-of-way not currently in service and allow interim use of the land as recreational trails."  *Preseault v. ICC,* 494 U.S. 1, 6, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).  The amendments provided that the interim use of the right-of-way as a recreational trail would not be treated as an abandonment of its use for railroad purposes.  *Id.* at 7; 16 U.S.C. 1247(d).  Because, under state law, in many cases the right-of-way acreage otherwise would have reverted to the underlying landowner when no longer used by the railroad, the statutory provision gave rise to takings questions under the Fifth Amendment.  *Id.* at 8.  The Supreme Court held in *Preseault* that claims for any takings that occurred could be asserted in the Claims Court under the Tucker Act (28 U.S.C. 1491).  *Id.* at 16-17.[16]

---

[15] After abolition of the ICC, the task was assigned to the Surface Transportation Board.  *Hash v. United States,* 2000 U.S. Dist. LEXIS 20061, at *3 n.2 (D. Idaho July 7, 2000).

[16] Under the "Little Tucker Act," 28 U.S.C. 1346, federal district courts had concurrent jurisdiction over such claims in amounts of $10,000 or less.  *See, e.g., Hash,* 2000 U.S. Dist. LEXIS 20061, at *2.

As stretches of railroad rights-of-way were approved for interim trail use, adjoining landowners brought such takings claims and sought to certify classes for their adjudication. *See, e.g., Moore v. United States,* No. 93-134 L, 41 Fed. Cl. 394, 1998 U.S. Claims LEXIS 148 (Jul. 2, 1998); *Bywaters v. United States,* No. 6:99CV451, 196 F.R.D. 458, 464-65, 2000 U.S. Dist. LEXIS 19638 (E.D. Tex. Aug. 25, 2000); *Hash,* 2000 U.S. Dist. LEXIS 20061. In their opposition to the claimants' efforts to certify classes under rule 23(b)(3), the defendants urged that the fact-intensive and "individualized nature" of a takings case meant that the issues specific to each claimant would predominate over the common issues. *See, e.g., Hash* 2000 U.S. Dist. LEXIS 20061, at *38-39. The courts rejected the defendants' contention, finding that questions of law or fact common to the class members predominated over questions affecting only individual members. *E.g., Hash,* 2000 U.S. Dist. LEXIS 20061, at *40.

For several reasons, we find that comparison of the Rails to Trails cases with that before us actually favors the trial court's resolution of the predominance issue in this case.

First, in the Rails to Trails cases, the location and extent of the railroad rights-of-way that were the subject of the asserted takings would be readily identified and subject to generalized proof, as would the date and nature of the governmental action constituting the taking. *See, e.g., Hash* 2000 U.S. Dist. LEXIS 20061, at *42 ("Each class member claims a taking as a result of the uniform application of a single federal statute to a single rail line. The class also shares in common the identical nature and date of taking by the Government").

14

We recognize that appellants are not suggesting that the course of the Canadian River is like the comparatively uniform and regular path of a railroad right-of-way. But rather clearly the determination of the property taken from each class member is significantly more complex here than in the Rails to Trails cases.

Second, unlike those cases, the record here does not identify a common nature and date of taking by the State. Appellants' pleadings and argument point to the State's adoption of the Shine I survey as the event that deprived them of their property, but as noted Shine I covers only part of the 12-mile span of the river included in the proposed class. As to the other miles, appellants referred in the trial court to other actions taken by the State, but there is no indication those other actions are subject to class-wide proof.

Finally, we note that *Hash,* and other Rails to Trails cases appellants cite, are decisions of trial-level courts in which the proposed class action would be tried. That those courts treated the predominance issue in a manner different from the trial court here does not demonstrate an abuse of discretion.

For all these reasons, on the record before the court, we are satisfied the trial court did not abuse its discretion by concluding questions affecting only individual members would predominate in the litigation over questions common to the class, and for the same reasons, that its litigation as a class action is not superior to other available methods for its fair and efficient adjudication.

15

Rule 42(a)(3)—Typicality

The only rule 42(a) prerequisite remaining in issue is the typicality requirement of subsection (a)(3).

"A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Sw. Bell Tel. Co.,* 308 S.W.3d at 920 (citation and internal quotation marks omitted); 7B C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 3d § 1764, at 270-71 (2005 ed.) (noting "many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory" (footnotes omitted)).

Here, the trial court gave two reasons for finding typicality lacking. The court first found the claims of the proposed representatives are not typical of the class claims because Riemer's "right to have a boundary suit conflicts with other class members' taking claim." The court based its finding on the State's argument that Riemer's right to bring a boundary suit conflicts with the takings claims he and the other potential class members assert because claiming ownership of any riverbed land for quieting title requires that he deny a taking by the State.

The State supports the argument by citing *Hotels.com, L.P. v. Canales,* which finds the typicality requirement satisfied when a plaintiff proves "she possesses the same interest and suffered the same injury as the other members of the class, that her claims are based on the same legal theory as the other class members' claims and that

she does not have certain potential defenses peculiar to her." 195 S.W.3d 147, 154 (Tex. App.—San Antonio 2006, no pet.) (emphasis added). But *Canales* does not prohibit additional claims by class representatives that protect the same interests as those held by the proposed class members. Here, the difference between the class takings claims and Riemer's action to quiet title is the remedy pursued. We find this does not defeat typicality.

Moreover, it is established that neither of the conflicts identified by the trial court preclude satisfaction of the adequacy-of-representation standard of rule 42(a)(4). *Riemer,* 392 S.W.3d at 637. The typicality requirement is sometimes said to buttress the adequate representation requirement of subsection (a)(4). *See* 7B C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 3d § 1764, at 264 (3d ed. 2005) (discussing federal rule 23(a)).

For both those reasons, we find the trial court abused its discretion in finding Riemer's suit to quiet title destroyed typicality.

The second reason the trial court gave for finding appellants' claims not typical of the class claims is that Riemer's and Johnson's takings claims "have a substantial likelihood of being barred by limitations."

> The presence of an arguable defense unique to the named plaintiff properly negates typicality only when it is predictable that such defense will become a major focus of the litigation, such that the named plaintiff will become distracted by the presence of a possible defense that the representation of the rest of the class will suffer.

*Bailey v. Kemper Cas. Ins. Co.*, 83 S.W.3d 840, 854 (Tex. App.—Texarkana 2002, pet. dism'd w.o.j.) (citations and internal quotation marks and punctuation omitted); *see*

*Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 363 (Tex. App.—Dallas 2004, pet. denied) (finding limitations defense unique to class representative did not render representative's claims atypical because issues of standing and limitations were legal issues and did not involve "disputed facts"); *Alford Chevrolet-Geo v. Jones*, 91 S.W.3d 396, 405 (Tex. App.—Texarkana 2002, pet. denied) ("Texas courts have held that the existence of differing affirmative defenses will not prevent class certification").

The State relies on evidence Hugo Riemer consulted counsel and claimed the Shine I survey constituted a "taking" well over ten years before he filed a takings claim, and that Coon testified he knew about the survey when it was conducted in 1981. We do not agree that the evidence cited supports a conclusion it is predictable either named representative will become distracted by the presence of a possible limitations defense or that the representation of the rest of the class will thereby suffer.

Accordingly, we conclude the trial court abused its discretion also by finding typicality not satisfied because of potential limitations defenses.

### Conclusion

We find the trial court abused its discretion in its finding the requirements of typicality under rule 42(a) were not met, but properly found that the proposed class met the requirements of neither rule 42(b)(1)(A) nor rule 42(b)(3), and thus affirm the trial court's order denying certification of the proposed class.

James T. Campbell
Justice

18